(Slip Opinion)

# Congressional Oversight of the White House

Congressional oversight of the White House is subject to greater constitutional limitations than oversight of the departments and agencies of the Executive Branch, in light of the White House staff's important role in advising and assisting the President in the discharge of his constitutional responsibilities, the need to ensure the independence of the Presidency, and the heightened confidentiality interests in White House communications.

January 8, 2021

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum opinion summarizes the principles and practices governing congressional oversight of the White House. The White House, as we use the term here, refers to those components within the Executive Office of the President ("EOP"), such as the White House Office and the National Security Council, whose principal function is to advise and assist the President in the discharge of the duties of his office. All three branches of government have recognized that the White House has a role and status distinct from the executive branch departments and agencies, and this Office has long recognized those distinctions to be critical to the development of principles and practices for congressional oversight addressed to the White House.

The Constitution vests all of "[t]he executive Power" in the President and charges him alone with the responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. In carrying out that charge, the President necessarily depends on "the assistance of subordinates," *Myers v. United States*, 272 U.S. 52, 117 (1926), most of whom are his appointed officials in the executive departments and agencies. Yet the size and complexity of modern federal administration have required the establishment of the White House as an organizational apparatus to directly support the President in the discharge of his responsibilities. White House personnel work in close proximity to the President and advise and assist him in the development of presidential policy, in supervising and guiding the affairs of the executive branch departments and agencies, and in communicating with Congress, the American public, and foreign governments.

1

The White House's important role in advising and assisting the President has special significance for congressional oversight. Each House of Congress has, as an adjunct to its legislative power, the constitutional authority to obtain information, a power typically carried out through its committees. But this investigative authority, often referred to as "oversight" authority, is subject to limitations. A congressional information request "is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)). Consequently, the Executive Branch must scrutinize the asserted legislative purpose underlying a congressional request by examining the objective fit between that purpose and the information sought. Because Congress may conduct oversight investigations only with respect to "'subject[s] on which legislation could be had,'" *id.* (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975)), Congress may not conduct such investigations for the purpose of reviewing the discharge of functions exclusively entrusted to the President by the Constitution. *See, e.g.*, *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (Reno, Att'y Gen.) ("*Clemency Decision*").[1] It follows that the activities of White House advisers are less likely than the activities of the departments' and agencies' staffs to involve matters within Congress's oversight authority.

Even when Congress operates within the appropriate scope of its oversight authority, the Constitution places additional separation of powers constraints on inquiries directed at the White House. The Supreme Court

---

[1] This memorandum addresses Congress's authority to investigate in furtherance of its power to legislate. *See McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). We do not consider Congress's parallel authority to obtain the information necessary to the discharge of its other powers, such as the House's power to impeach, although we have recognized that similar principles apply in those areas. *See, e.g.*, *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at *3 (Nov. 1, 2019) (recognizing "that a congressional committee must likewise make a showing of need that is sufficient to overcome [executive] privilege in connection with an impeachment inquiry"); Letter for Pat A. Cipollone, Counsel to the President, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel at 2 (Nov. 3, 2019) (recognizing that the immunity of certain presidential advisers from compelled congressional testimony "applies in an impeachment inquiry just as it applies in a legislative oversight inquiry").

has recognized the importance of "the Executive Branch's interests in maintaining the autonomy of [the Presidency] and safeguarding the confidentiality of its communications." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004). These concerns are particularly acute with respect to White House advisers. Congressional oversight directed at the White House must be conducted in a way that protects the ability of the White House to function effectively in advising and assisting the President as he carries out his responsibilities under the Constitution.

Congressional inquiries are also constrained by the heightened confidentiality interests in White House communications. *See id.* At the core of those interests is the presidential communications component of executive privilege, which covers many White House communications involving presidential decision-making. Congressional inquiries directed to the White House must take account of the presumptive application of executive privilege to White House communications, as well as the President's interests in autonomy and independence. Even when the White House may have relevant information, these separation of powers and privilege concerns weigh in favor of Congress seeking available information first from the departments and agencies before proceeding with White House requests.[2]

This memorandum proceeds in four Parts. Part I describes the development of the White House as an organization and its central role in advising and assisting the President. Part II discusses the scope of congressional oversight authority and the limits on that authority as it applies to matters related to the discharge of the President's constitutional functions. Part III explains that when Congress directs its oversight requests to the White House, the constitutionally mandated "accommodation process" should take into account the limitations imposed on those requests by separation of powers principles and the heightened executive privilege interests attending the communications of the White House.

---

[2] Although this memorandum addresses the EOP components whose principal function is to advise and assist the President, many of the principles discussed here would apply as well to so-called "dual hat" presidential advisers in other components who "exercise substantial independent authority or perform other functions in addition to advising the President." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). To the extent that Congress directs oversight efforts at activities implicating the advising "hat" of those officials, many of the same principles governing oversight would apply.

Finally, Part IV assesses the mechanisms for enforcing congressional subpoenas and discusses legal issues commonly raised by congressional subpoenas directed to White House staff. Historically, Congress has had no shortage of ways to use its powers to press executive branch officials to negotiate and to comply with appropriate informational demands. Although congressional committees have recently sued to enforce several subpoenas against executive officials, those lawsuits lack a foundation in our Nation's history and fall outside the constitutional and statutory jurisdiction of the federal courts. Congress and the Executive Branch have traditionally worked out their disputes through negotiation and compromise, and the Department of Justice believes that those time-tested methods are the appropriate means for resolving disputes over congressional information requests, no matter whether directed at the White House or the departments and agencies within the Executive Branch.

## I. Historical Background

Article II of the Constitution establishes a unitary Executive Branch headed by the President, and it assigns to him an array of important functions, including responsibility for the Nation's foreign relations, military affairs, and law enforcement. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) ("The entire 'executive Power' belongs to the President alone."); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 550–51 (1977) (Rehnquist, J., dissenting) ("[T]he President is made the sole repository of the executive powers of the United States, and the powers entrusted to him as well as the duties imposed upon him are awesome indeed."). It is no surprise that, in a "world of extraordinary administrative complexity and near-incalculable presidential responsibilities," Presidents have consistently and increasingly turned to the "assistance of close aides" in the White House to carry out their duties. Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2273 (2001).

The White House's modern organizational form traces to the EOP's creation in 1939 as "an institutional response to needs felt by every occupant of the Oval Office . . . . [T]hese were, and remain, needs for advice and assistance." Harold C. Relyea, *The Executive Office Concept*, in *The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide* 4 (Harold C. Relyea ed., 1997). As one leading scholar

put it a decade after its establishment, "[t]he creation of the Executive Office of the President was a milestone in the history of the Presidency." George A. Graham, *The Presidency and the Executive Office of the President*, 12 J. Pol. 599, 603 (1950); *see also* Wayne Coy, *Federal Executive Reorganization Re-examined: Basic Problems*, 40 Am. Pol. Sci. Rev. 1124, 1131–32 (1946) ("[T]he largest step toward enabling the President to 'take care' of the effective operation of the administrative system occurred in 1939, with the establishment of the Executive Office of the President.").

Long before the EOP's establishment, Presidents received confidential advice and assistance from individuals other than department and agency heads. President Jackson sought help from a group of informal advisers known as the "Kitchen Cabinet," which "performed most of the functions of a modern staff, serving his personal and political needs." Richard B. Latner, *The Kitchen Cabinet and Andrew Jackson's Advisory System*, 65 J. Am. Hist. 367, 379 (1978). Historians have characterized this group of informal advisers "as an early prototype of the President's White House staff, a group of personal aides providing the President with a variety of services." *Id.* at 378; *see also id.* (noting that Jackson's informal advisers shared his "perspective in overseeing the general direction of his administration, instead of the more limited perspective of department heads"). The tradition of Jackson-style kitchen cabinets continued for nearly a century: "John Tyler had his 'Virginia Schoolmasters'; Grover Cleveland maintained a 'Fishing Cabinet'; Teddy Roosevelt sported the 'Tennis Cabinet'; Warren Harding encouraged a 'Poker Cabinet'; [and] Herbert Hoover instituted a 'Medicine Ball Cabinet.'" Relyea, *The Executive Office Concept* at 43.

During the 1920s, Congress considered several proposals to more formally establish the "administrative machinery" needed "to enable the President to discharge his managerial duties." Edward H. Hobbs, *An Historical Review of Plans for Presidential Staffing*, 21 L. & Contemp. Probs. 663, 670 (1956). Although these initial proposals were not adopted, the advent of the New Deal spurred lasting action. As the administrative state dramatically expanded, President Franklin D. Roosevelt realized that he needed more staff to enable him to carry out his mounting responsibilities. In early 1936, he established a three-member committee charged with "investigat[ing] and report[ing]" upon "the organization for the perfor-

mance of the duties imposed upon the President in exercising the executive power vested in him by the Constitution of the United States." President's Committee on Administrative Management, *Administrative Management in the Government of the United States* 2 (1937) ("Brownlow Report"). The President's Committee on Administrative Management, more commonly known as the Brownlow Committee after its chair, "surveyed the landscape immediately after the spate of New Deal reforms, [and] found a President who although 'now ha[ving] popular responsibility' for the 'direction and control of all departments and agencies of the Executive Branch . . . [was] not equipped with adequate legal authority or administrative machinery to enable him to exercise it.'" Kagan, *Presidential Administration*, 114 Harv. L. Rev. at 2275.

The Brownlow Committee "drafted a blueprint for an administrative staff agency, which [it] labeled the Executive Office." Hobbs, *Plans for Presidential Staffing*, 21 L. & Contemp. Probs. at 674. The Committee's final report recommended that Congress "[e]xpand the White House staff so that the President may have a sufficient group of able assistants in his own office to keep him in closer and easier touch with the widespread affairs of administration and to make a speedier clearance of the knowledge needed for executive decision." Brownlow Report at 46. Stressing the urgent need for reform, the Committee included in its report a warning: "The President needs help. His immediate staff assistance is entirely inadequate." *Id.* at 5.[3]

President Roosevelt strongly endorsed the Committee's recommendations. He stated that "[t]he plain fact is that the present organization and equipment of the Executive Branch of the Government defeat the Constitutional intent that there be a single responsible Chief Executive to coordinate and manage the departments and activities in accordance with the laws enacted by the Congress." *A Recommendation for Legislation to Reorganize the Executive Branch of the Government* (Jan. 12, 1937), 5 Pub. Papers of Pres. Franklin D. Roosevelt 668, 670 (1938).

---

[3] Louis Brownlow later recounted that the EOP's mission as contemplated by his Committee was to ensure that the President could "control the policies of his departments, while leaving to the head of each department the decisions which are peculiar to its activity and the work incidental thereto." Louis Brownlow, *The Executive Office of the President: A General View*, 1 Pub. Admin. Rev. 101, 104 (1941).

Congress authorized President Roosevelt to establish the EOP under the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561; soon thereafter, he issued Reorganization Plan No. 1, which became effective in July 1939, 4 Fed. Reg. 2727, 53 Stat. 1423. President Roosevelt implemented the reorganization plan by executive order, organizing the EOP into five divisions, each charged with a distinct mission. Notably, the White House Office would "serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office." Exec. Order No. 8248, 4 Fed. Reg. 3864, 3864 (Sept. 8, 1939). The Order provided that presidential assistants would hold "no authority over anyone in any department or agency" and should "[i]n no event . . . be interposed between the President and the head of any department or agency." *Id.*

EOP officials soon came to take a leading role in developing and coordinating policy recommendations for the President. Within its first decade, the EOP expanded to include entities specifically created for those purposes. The Council of Economic Advisers, for example, was established in the EOP in 1946 to "analyze and interpret economic developments" and "formulate and recommend national economic policy to promote full employment, production, and purchasing power under free competitive enterprise." Employment Act of 1946, Pub. L. No. 79-304, § 4(a), 60 Stat. 23, 24. A year later, the National Security Council was created to "advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security so as to enable the military services and the other departments and agencies of the Government to cooperate more effectively in matters involving the national security." National Security Act of 1947, Pub. L. No. 80-253, § 101(a), 61 Stat. 495, 496.[4] By the end of the Truman Administration, the EOP had grown to eleven principal units. Harold C. Relyea, Cong. Research Serv., 98-606 GOV, *The Executive Office of the President: An Historical Overview* 9 (updated Nov. 26, 2008).

As the White House developed as an organization, all three branches of government recognized that it should be viewed differently from the departments and agencies of the Executive Branch. With respect to congressional oversight specifically, in the 1970s Assistant Attorneys General

---

[4] The National Security Council formally became an EOP component upon the adoption of Reorganization Plan No. 4 of 1949, 63 Stat. 1067.

William Rehnquist and Antonin Scalia, among others, recognized that the President's immediate White House advisers must be treated differently from officials of the departments and agencies when Congress seeks their testimony. *See* Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* (Feb. 5, 1971); Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974); *see also infra* Part IV.B.

Congress and the federal courts similarly recognized the need to treat the President's inner circle of advisers differently under other federal laws. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). Thus, although the Freedom of Information Act ("FOIA") by its terms applies to the EOP, 5 U.S.C. § 552(f)(1), the Supreme Court held that Congress did not include "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (quoting H.R. Rep. 93-1380, at 15 (1974) (Conf. Rep.)). Federal courts have accordingly limited FOIA to exclude various EOP components, making this determination by considering "how close operationally the [component] is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure." *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993); *see also, e.g.*, *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) (holding that Secret Service logs of visitors to such advise-and-assist EOP offices are not "agency records" for purposes of FOIA).

Congress similarly recognized that the President should have plenary discretion when it comes to hiring, paying, and organizing certain White House staff. In 1978, Congress authorized the President "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law." Pub. L. No. 95-570, 92 Stat. 2445, 2445 (codified at 3 U.S.C. § 105(a)). As this Office later observed, that statute "reflect[s] Congress's judgment that the President should have complete discretion

in hiring staff with whom he interacts on a continuing basis." *Applicability of the Presidential Records Act to the White House Usher's Office*, 31 Op. O.L.C. 194, 197 (2007). As in the FOIA context, Congress thus viewed the advise-and-assist components of the White House as not only different from the departments and agencies, but also different from the other components of the EOP. *See Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 223 (D.C. Cir. 2009). Congress has continued to recognize that distinction up to the present day. *See, e.g.*, Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 2(e), 128 Stat. 2003, 2006–07 (codified at 44 U.S.C. § 2209) (prohibiting "the immediate staff of the President" and any "unit or individual of the Executive Office of the President whose function is to advise and assist the President" from sending presidential records using non-official electronic message accounts).

The White House continues to play a unique role in the Executive Branch, providing the President with close and confidential advice and assistance on a daily basis. The White House acts as the President's primary information-gathering and policy-development arm, and serves as "something of a central nervous system of the executive branch. . . . [It] is a 'force multiplier.' Without it, the President would be greatly weakened in his struggle to instantiate his preferences within the executive branch." Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701, 714, 716 (2009). This memorandum opinion's remaining Parts explain how the White House's special status affects congressional oversight.

## II. Scope of Congressional Oversight Authority

Although "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," each House has implied authority to secure the information "needed" to legislate. *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted); *McGrain v. Daugherty*, 273 U.S. 135, 160–61 (1927). Each House may "make investigations and exact testimony, to the end that it may exercise its legislative function advisedly and effectively." *McGrain*, 273 U.S. at 161; *see also Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985) ("*Scope of Congressional Oversight*") ("It is

beyond dispute that Congress may conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws."). The House and Senate typically exercise their investigative functions through delegations to committees, each of which has jurisdiction over identified legislative subjects and agencies. The investigative authority of each committee is bounded by its subject matter jurisdiction, as identified by the rules and resolutions of the relevant congressional chamber.

Congress's authority to investigate in furtherance of its power to legislate has come to be known as its "oversight" authority, but that shorthand term does not imply a general authority to review the actions of the Executive Branch. Congress may direct the departments and agencies through the enactment of appropriate legislation, but the Constitution does not otherwise confer on Congress or its committees an authority to "oversee" or direct the Executive Branch in the conduct of its assigned duties and responsibilities under Article II. Rather, because Congress enjoys an implied power of investigation that "is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations." *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 197). Two of these limitations have particular significance for congressional oversight of the White House. First, because a congressional oversight request "is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress,'" it "must serve a 'valid legislative purpose.'" *Id.* (quoting *Watkins*, 354 U.S. at 187; *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Second, and relatedly, the scope of oversight authority is limited to subjects "on which legislation could be had," *McGrain*, 273 U.S. at 177, and therefore Congress "cannot inquire into matters which are within the exclusive province of one of the other branches of the Government," *Barenblatt v. United States*, 360 U.S. 109, 112 (1959), including any function committed exclusively to the President by the Constitution.[5]

---

[5] Congressional oversight authority may encompass inquiries into the Executive Branch's use of appropriated funds with respect to statutory programs as well as inquiries relevant to future appropriations. However, as *Barenblatt* makes clear, the fact that the President or the federal courts may rely upon appropriated funds to carry out their activities does not mean that everything they do falls within the scope of the oversight authority. Otherwise, no matter would fall within the "exclusive province of one of the other branches of the Government." *Barenblatt*, 360 U.S. at 112. Rather, "[s]ince Congress may

## A. Legitimate Legislative Purpose

Congress may conduct investigations only for legitimate legislative purposes. This Office has long counseled that "a threshold inquiry that should be made [by the Executive] upon receipt of any congressional request for information is whether the request is supported by any legitimate legislative purpose." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 74 (1986) ("*Independent Counsel Act Requests*"). As Assistant Attorney General William Barr explained, the Executive Branch need only assess its "interest in keeping [requested] information confidential" after "it is established that Congress has a legitimate legislative purpose for its oversight inquiry" in the first place. *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Congressional Requests*"); *see also Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __, at *21 (June 13, 2019) ("*President's Tax Returns*") (reiterating this position).

Because Congress may obtain information only where it will advance a legitimate legislative purpose, the other branches of government must review congressional information requests to ensure that they are not motivated by an illegitimate purpose. As the Supreme Court recently explained in *Trump v. Mazars*:

> Congress has no "'general' power to inquire into private affairs and compel disclosures," [*McGrain*, 273 U.S.] at 173–174, and "there is no congressional power to expose for the sake of exposure," *Watkins*, 354 U.S. at 200. "Investigations conducted solely for the per-

---

only investigate into those areas in which it may potentially *legislate or appropriate*, it cannot inquire into matters which are within the [Executive's] exclusive province[.]" *Id.* at 111–12 (emphasis added). Therefore, the limits placed on Congress when conducting oversight pursuant to its general legislative power also apply to oversight conducted pursuant to its appropriations authority. While Congress may, pursuant to its appropriations authority, review manpower statistics and other non-substantive data regarding the resources that Presidents historically invest in areas of exclusive executive authority, Congress lacks the authority to inquire into the Executive's substantive decision-making in these areas.

> sonal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* at 187.

140 S. Ct. at 2032; *see also Branzburg v. Hayes*, 408 U.S. 665, 699–700 (1972) (a legislative committee "abuse[s] its proper function" when it exposes for the sake of exposure). Without these limits, the Court cautioned, "Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense[.]" *Mazars*, 140 S. Ct. at 2034 (quoting *The Federalist* No. 71, at 484 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).[6]

Although courts, in reviewing subpoenas directed at private parties, have traditionally deferred to Congress's perceptions of its need for the information being sought, *see, e.g.*, *Barenblatt*, 360 U.S. at 132, the Supreme Court in *Mazars* suggested that such a deferential approach does not extend to congressional subpoenas directed at the President's personal information because of the separation of powers principles at stake in any such request, *see* 140 S. Ct. at 2031; *see also id.* at 2034–36. In such cases, a court must "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose"; "[t]he more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* at 2036. Moreover, "unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation," it will be "impossible to conclude that a subpoena is designed to advance a valid legislative purpose." *Id.* (internal quotation marks omitted); *see also Watkins*, 354 U.S. at 201, 205–06 (reversing a contempt charge due to, among other things, a "vague" and "broad" committee charter that rendered it "impossible . . . to ascertain whether any legislative purpose justifie[d] the disclosures sought and, if so, the importance of that information to the Congress in furtherance of its legislative function").

---

[6] In the course of its oversight activities, Congress may "inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins*, 354 U.S. at 200 n.33. It may not, however, conduct oversight solely for the purpose of making information public. The Supreme Court has made clear that Congress "may only investigate into those areas in which it may potentially legislate or appropriate," *Barenblatt*, 360 U.S. at 111, and transmitting information "to inform the public . . . is not a part of the legislative function," *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979).

The Supreme Court's review in *Mazars* of a House committee's pursuit of the President's financial information was consistent with how the Executive Branch has reviewed similar requests from Congress directed at the Executive Branch. Although the Executive Branch should seek to accommodate legitimate requests for information concerning the departments and agencies, this Office has advised that such accommodation may not be required where congressional committees' requests appear to fall outside their delegated legislative jurisdiction or lack a legitimate legislative purpose.

For instance, shortly before the *Mazars* decision, we concluded, based on reasoning similar to *Mazars*, that a request from the House Ways and Means Committee to the Department of the Treasury for the President's tax returns was not supported by a legitimate legislative purpose. *President's Tax Returns*, 43 Op. O.L.C. __, at *3. Although the committee sought records similar to those at issue in *Mazars*, the Chairman proffered a different reason for the request, claiming that the committee sought to evaluate the Internal Revenue Service's practice of auditing Presidents' tax returns. *Id.* at *2, *26–27. We advised that executive branch officials were not obliged simply to accept the committee's proffered legislative purpose at face value, but instead must "examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *Id.* at *17; *see also id.* at *20 (noting the Executive Branch's obligation to "confirm[] the legitimacy of an investigative request," especially "when deferring to the request would effectively surrender the Executive's obligations to a Member of Congress"). In that case, the Chairman and other House leaders had made numerous public statements suggesting that the request was aimed at publicly exposing the President's tax returns, so "[n]o one could reasonably believe that the Committee [sought] six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit process." *Id.* at *16–17. We also stressed that the institutional reasons that have sometimes led courts to defer to Congress's stated legislative purpose in cases involving private parties do not apply to the Executive Branch, "which operates as a politically accountable check on the Legislative Branch." *Id.* at *25. We concluded that the Chairman's stated legislative purpose for his request for the President's

tax returns "blink[ed] reality" and was "pretextual," *id.* at \*16, and therefore was not legitimate.

This Office similarly questioned the legislative purpose underlying three House committees' joint request for documents related to American foreign and defense policy with respect to Ukraine. There, the three committees had announced an investigation into the impeachment of the President, even though the full House had not delegated any such investigative jurisdiction to any of them. *House Committees' Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at \*47–49 (Jan. 19, 2020) ("*Authority to Investigate for Impeachment*"). In view of this basic legal defect in the requests, *see id.*, the committees supplemented them by claiming that they fell within their "oversight and legislative jurisdiction." *Id.* at \*8, \*47 (internal quotation marks omitted).

We concluded that this attempt to justify the request did not establish a legitimate legislative purpose, even though some of the requested materials might well have fallen within the oversight jurisdiction of one or more of the committees. The committee chairs had "made clear" in their official correspondence "that the committees were interested in the requested materials to support an investigation into the potential impeachment of the President, not to uncover information necessary for potential legislation within their respective areas of legislative jurisdiction." *Id.* at \*48. We explained that "[t]he Executive Branch need not presume that [a legislative] purpose exists or accept a makeweight assertion of legislative jurisdiction." *Id.* at \*47 (internal quotation marks omitted). We thus found that the committee chairmen were "seeking to do precisely what they said— compel the production of information to further an impeachment inquiry." *Id.* at \*48. The inquiry therefore was made not to advance a legitimate legislative purpose, but instead to further an impeachment investigation that had not been authorized at the time the subpoenas were issued. *Id.* at \*48–49.

We also emphasized the importance of committee jurisdiction, noting that "[a] congressional committee's 'right to exact testimony and to call for the production of documents' is limited by the 'controlling charter' the committee has received from the House." *Id.* at \*2 (quoting *United States v. Rumely*, 345 U.S. 41, 44 (1953)); *see also id.* at \*18–19 (discussing the committee jurisdiction requirement in the oversight and impeachment contexts); *Watkins*, 354 U.S. at 206 ("Plainly [the House's] committees

are restricted to the missions delegated to them . . . . No witness can be compelled to make disclosures on matters outside that area.").

We think that the separation of powers principles described in *Mazars* and our recent opinions guide the appropriate approach to congressional oversight requests directed at the White House, which inherently raise separation of powers concerns. "[I]n assessing whether a subpoena directed" at the White House "is related to, and in furtherance of, a legitimate task of Congress," the White House "must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President." *Mazars*, 140 S. Ct. at 2035 (internal quotation marks omitted). Although *Mazars* addressed a subpoena that sought the President's personal financial information, there is no reason to think that a lesser standard would apply to oversight requests directed at the White House and its staff—requests that bear even more closely upon interests of confidentiality and the autonomy of the Executive Branch. The Court made clear that "congressional subpoenas for the President's information unavoidably pit the political branches against one another," *id.* at 2034, and therefore, all such requests necessarily raise separation of powers concerns. *See also id.* at 2030 (describing certain congressional requests for official documents as seeking "the President's information"). And the case for closely scrutinizing such requests is even stronger where it is not, as in *Mazars*, a court that is evaluating the request, but instead the Executive Branch during the constitutionally required accommodation process—one purpose of which is to provide a process for the Executive Branch to check an implied investigative power that otherwise has limited counterweights. *See President's Tax Returns*, 43 Op. O.L.C. __, at *25–26; *see also infra* Part III.C (discussing the accommodation process).

In such instances, we have advised that Congress may be expected to clearly articulate its legislative purpose, and the Executive Branch may independently review the proffered purpose. In considering a committee's legislative purpose, the White House should "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. "The more detailed and substantial the evidence of Congress's legislative purpose, the better." *Id.* The White House may fairly expect that the committee will provide a statement that "adequately identifies its aims and explains why the Presi-

dent's information will advance its consideration of the possible legislation." *Id.* In reviewing such a statement, the White House may take into account all relevant facts and circumstances in ensuring that the congressional request serves a legitimate legislative purpose within the appropriate authority of the requesting committee.

## B. Exclusive Executive Functions

Because congressional requests for information must "concern[] a subject on which legislation could be had," *U.S. Servicemen's Fund*, 421 U.S. at 506 (internal quotation marks omitted), Congress may not conduct oversight of the President's discharge of his exclusive constitutional authority. "Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt*, 360 U.S. at 111–12; *see also Scope of Congressional Oversight*, 9 Op. O.L.C. at 62 (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain"). Congressional requests to the White House often run into this limitation to the extent they are directed at the President's exercise of his constitutional, rather than statutory, authorities.

This Office has observed that "[t]he Constitution assigns a variety of powers exclusively to the President" and "Congress may not intrude upon the President's exercise of [those] exclusive powers." Letter for Andrew Fois, Assistant Attorney General, Office of Legislative Affairs, from Randolph D. Moss, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Inspector General for the Executive Office of the President* at 3 (July 24, 1996) (advising that proposed legislation to establish an inspector general for the EOP raised serious constitutional concerns). As we explained, "where the President is exercising, or has exercised, exclusive constitutional authority, Congress is wholly without authority to impose [disclosure] requirements on the President or the President's advisors." *Id.* Because Congress may not legislate with respect to the President's discharge of his exclusive constitutional functions, it similarly may not seek information from White House staff concerning the decision-making process in connection with the President's performance of those functions in particular matters.

Attorney General Janet Reno drew this line in advising President Clinton with respect to a congressional subpoena seeking predecisional documents relating to a grant of clemency. The President's clemency decision, which is rooted in the pardon power, is a quintessential example of an exclusive executive power. *See Schick v. Reed*, 419 U.S. 256, 266 (1974) (the pardon power "flows from the Constitution . . . and . . . cannot be modified, abridged, or diminished by the Congress"). Attorney General Reno advised that Congress lacked the authority to subpoena the documents in question, because "[t]he granting of clemency pursuant to the pardon power is unquestionably an exclusive province of the executive branch," and thus "[a] compelling argument can be made . . . that Congress has no authority whatsoever to review a President's clemency decision." *Clemency Decision*, 23 Op. O.L.C. at 2.[7] Consistent with this conclusion, she explained, "it appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision." *Id.* at 3–4.[8]

In 2007, Acting Attorney General Paul Clement cited the President's exclusive constitutional powers in advising President Bush regarding an assertion of executive privilege with respect to internal White House communications concerning the possible exercise of the President's

---

[7] As a formal matter, the President asserted executive privilege in declining to provide the subpoenaed documents, which related to the deliberations over the President's grant of clemency to sixteen members of the FALN terrorist group. Letter for Dan Burton, Chairman, Committee on Government Reform, U.S. House of Representatives, from Cheryl Mills, Deputy Counsel to the President at 1 (Sept. 16, 1999) (relying on the "vital public interest in assuring that the President receives candid advice from his advisors"). But the White House Counsel's Office also raised the jurisdictional issue in objecting to the subpoena, stating that "[p]ursuant to the Constitution and the separation of powers doctrine, the President's authority to grant clemency is not subject to legislative oversight." *Id.*

[8] This position also served as the basis for the Justice Department's refusal the next year to answer certain questions posed by the House Judiciary Committee regarding a pending clemency petition. *See* Letter for Henry J. Hyde, Chairman, Committee on Judiciary, U.S. House of Representatives, from Robert Raben, Assistant Attorney General, Office of Legislative Affairs at 2 (June 21, 2000) ("[B]ecause Congress cannot legislate regarding the process by which the Department assists the President on clemency matters, Congress' oversight authority does not extend to that process.").

exclusive authority to nominate and to dismiss U.S. Attorneys: "[T]here is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone." *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 3 (2007). As Acting Attorney General Clement explained:

> The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults with members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.

*Id.*

This principle limiting the scope of Congress's oversight authority is consistent with the Supreme Court's refusal to tolerate legislation that intrudes on the President's exclusive constitutional powers and duties. Where the Constitution's text commits a power to the President exclusively, courts "refuse[] to tolerate *any* intrusion by the Legislative Branch." *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 485 (1989) (Kennedy, J., concurring in the judgment, joined by Rehnquist, C.J., and O'Connor, J.); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.").

The President's exclusive powers include the powers to pardon, to sign or veto legislation, to nominate and appoint officers of the United States, and to remove officers and other officials. *See Schick*, 419 U.S. at 266; *INS v. Chadha*, 462 U.S. 919, 946–48, 957–59 (1983) (holding the legisla-

tive veto an unconstitutional interference with President's duties pursuant to the Presentment Clause); *Buckley v. Valeo*, 424 U.S. 1, 138–39 (1976) (per curiam) ("Congress' power under [the Necessary and Proper] Clause is inevitably bounded by the express language of [the Appointments Clause]," and consequently Congress cannot provide for the appointment of "'Officers of the United States'" except through a procedure that "comports with" the Appointments Clause); *Myers*, 272 U.S. at 161 ("The authority of Congress given by the excepting clause to vest the appointment of such inferior officers in the heads of departments" does not "enable[] Congress to draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power. To do this would be . . . to infringe the constitutional principle of the separation of governmental powers."). Thus, while Congress may request information pertaining to the broad range of matters about which it may legislate, that authority does not extend to authorities exclusively vested in the President, including the work that the White House staff does in advising and assisting the President in connection with the execution of those constitutional authorities.

The President's exclusive authorities also include his powers in the area of diplomacy and national defense, although in many cases those powers closely abut areas in which Congress may legislate. The Constitution entrusts the President with the "'vast share of responsibility for the conduct of our foreign relations.'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). And that responsibility includes the "exclusive authority to conduct diplomacy on behalf of the United States." *Congressionally Mandated Notice Period for Withdrawing from the Open Skies Treaty*, 44 Op. O.L.C. __, at *11 (Sept. 22, 2020) (internal quotation marks omitted); *see also Prohibition of Spending for Engagement of the Office of Science and Technology Policy with China*, 35 Op. O.L.C. 116, 121 (2011) (recognizing the President's "exclusive authority to determine the time, scope, and objectives of international negotiations" (internal quotation marks omitted)). The President's authority as Commander in Chief and Chief Executive also includes broad authority over the deployment and control of the military in protecting American persons and interests abroad. *See, e.g.*, *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 61–62 (1941)

(Jackson, Att'y Gen.); *Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 185 (1996) ("It is for the President alone, as Commander-in-Chief, to make the choice of the particular personnel who are to exercise operational and tactical command functions over the U.S. Armed Forces."); *Relation of the President to the Executive Departments*, 7 Op. Att'y Gen. 453, 465 (1855) (Cushing, Att'y Gen.) (because the President "alone" is the "supreme commander-in-chief," Congress cannot "authorize or create any military officer not subordinate to the President"). The Executive Branch has consistently asserted the President's exclusive authority in these areas, and the Supreme Court has endorsed those principles.[9]

At the same time, Congress also has overlapping authority to legislate in matters touching upon foreign affairs and the national defense. Congress "clearly possesses significant Article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 225–26 (2009). Congress established and is responsible for funding the Department of State and the Department of Defense—two departments that the President relies upon in the discharge of his constitutional powers—and Congress also has express legislative authority under Article I, Section 8, with respect to foreign trade; the raising, supporting, and regulation of the armed forces; and the declaration of war, among other powers. Congress's legislative authority in these areas provides a basis for seeking information in connection with these areas, and such oversight requests may sometimes reach the White House.

---

[9] *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("[J]udicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate[.]"); *Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982) (conducting foreign relations and ensuring the Nation's defense are "central Presidential domains" (internal quotation marks omitted)); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase, C.J., concurring in judgment, joined by Wayne, Swayne, and Miller, JJ.) (Congress has no authority to "interfere[] with the command of the forces and the conduct of campaigns" because "[t]hat power and duty belong to the President as commander-in-chief"); *In re Hennen*, 38 U.S. (13 Pet.) 230, 235 (1839) ("As the executive magistrate of the country, [the President] is the only functionary intrusted with the foreign relations of the nation.").

We have previously advised on these areas of exclusive and overlapping authority in connection with congressional oversight requests related to the protection of classified information. The Supreme Court has explained that the President may "classify and control access to information bearing on national security and . . . determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information[.]" *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). This exclusive power primarily derives from his constitutional authority as "'Commander in Chief of the Army and Navy of the United States,'" *id.* (quoting U.S. Const. art. II, § 2, cl. 1), and "exists quite apart from any explicit congressional grant," *id.* Although Congress does not "entirely lack[] authority to legislate in a manner that touches upon disclosure of classified information," it cannot intrude—through legislation or oversight—upon the President's control over national security information. *Security Clearance Adjudications by the DOJ Access Review Committee*, 35 Op. O.L.C. 86, 95–96 (2011); *see The Department of Defense's Authority to Conduct Background Investigations for Its Personnel*, 42 Op. O.L.C. __, at *9 (Feb. 7, 2018) ("while Congress is not entirely disabled from participating in the system for protecting classified information, Congress may not impair the President's control over national security information").

In summary, because Congress's oversight authority extends only to those subjects "on which legislation could be had," *McGrain*, 273 U.S. at 177, the Executive Branch may properly review an oversight request directed at the White House to evaluate whether the request is directed at the discharge of an exclusive constitutional authority of the President or instead concerns a subject about which Congress may legislate.

### III. Constitutional Limits on Congressional Oversight of the White House

Even when a congressional inquiry advances a legitimate legislative purpose, the separation of powers imposes other constraints on oversight of the White House. The accommodation process requires that "each branch . . . take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am.*

*Tel. & Tel. Co.* ("*AT&T*"), 567 F.2d 121, 127 (D.C. Cir. 1977). As discussed below, the President's strong interests in the independence and autonomy of his office, as well as the confidentiality of his communications, justify corresponding restrictions on oversight of the White House.

Congressional requests for information from the White House are constrained by "the Executive Branch's interests in maintaining the autonomy of [the] office [of the President] and safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. In addition, oversight directed at the White House implicates heightened executive branch confidentiality interests, which are particularly strong with respect to White House communications. Accordingly, when oversight involves the White House, congressional committees and the White House must work to respect these constraints while accommodating the committees' legitimate information needs. These considerations mean that oversight requests directed to the White House are typically the exception, rather than the norm. Congress should generally seek information from the departments and agencies first before turning to the White House, and oversight requests to the White House must be tailored to accommodate the President's need for autonomy and confidentiality.

## A. Separation of Powers Principles

The President is the head of a co-equal branch of government. Congress and the President thus "have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Mazars*, 140 S. Ct. at 2033–34 (quoting *The Federalist* No. 51, at 349 (James Madison)). Consequently, congressional requests for information directed at the President and the White House are not "run-of-the-mill legislative effort[s]" and "differ markedly from" congressional requests directed toward others. *Id.* at 2034. The "significant separation of powers issues" raised by such requests "necessarily inform[]" the scope of and manner in which Congress may request such information. *Id.* at 2026, 2033. If Congress could freely demand the President's information, it would "'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense, just as the Framers feared." *Id.* at 2034 (quoting *The Federalist* No. 71, at 484). In the same way that the President must respect Congress's institutional prerogatives, Congress

too must conduct oversight mindful of the independence and autonomy of the office of the President.

Although the Supreme Court's opinion in *Mazars* discussed these principles in the context of congressional requests for the President's personal information, these separation of powers concerns also apply to requests for information from White House advisers, who assist the President "on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *5 (May 20, 2019) ("*Immunity of the Former Counsel*") (internal quotation marks omitted).

The Supreme Court recognized as much in *Cheney*, which addressed the special consideration owed to the White House in connection with demands for information made in a civil action. The Court held that the Judicial Branch must treat civil discovery requests directed at the President's senior advisers differently from discovery matters involving other executive branch personnel:

> This is not a routine discovery dispute. The discovery requests are directed to the Vice President and other senior Government officials who . . . give advice and make recommendations to the President. The Executive Branch, at its highest level, is seeking the aid of the courts to protect its constitutional prerogatives. . . . [S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated. This Court has held, on more than one occasion, that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery," and that the Executive's "constitutional responsibilities and status [are] factors counseling judicial deference and restraint" in the conduct of litigation against it.

542 U.S. at 385 (citations omitted). While the purposes of congressional oversight and civil discovery are distinct, both involve requests from outside the Executive Branch. Just as separation of powers principles require the Judicial Branch to adjust the "timing and scope of discovery"

directed at presidential advisers in civil litigation, congressional commit-
tees and White House personnel also must tailor the timing and scope of
their oversight accommodations in ways that respect the President's
interests in autonomy and confidentiality.

In *Cheney*, the Supreme Court reviewed the D.C. Circuit's denial of the
Vice President's petition for a writ of mandamus vacating certain discov-
ery orders issued by a district court. The plaintiffs had sued the Vice
President and others alleging that the President's National Energy Policy
Development Group had not complied with the disclosure requirements of
the Federal Advisory Committee Act, 5 U.S.C. app. §§ 1–15. The district
court ordered the plaintiffs to "submit a proposed discovery plan" for the
court's approval. *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*,
219 F. Supp. 2d 20, 56 (D.D.C. 2002). Under the Federal Rules of Civil
Procedure, a litigant "may obtain discovery regarding any nonprivileged
matter that is relevant to any party's claim or defense." Fed. R. Civ. P.
26(b)(1). Pursuant to this broad standard governing civil discovery, the
plaintiffs in *Cheney* proposed a wide-ranging discovery plan, which called
for the production of all documents and information concerning commu-
nications between individual National Energy Policy Development Group
members outside the context of group meetings, between members and
agency personnel, and between members and non-governmental individu-
als. The plaintiffs tried to use discovery to uncover confidential infor-
mation concerning the deliberations of the President's closest advisers.
The Government objected to the plan to the extent that it sought docu-
ments from the Vice President and White House officials and argued,
among other things, "that in order to protect the separation of powers, the
President should not be forced to consider the [executive] privilege ques-
tion in response to unnecessarily broad or otherwise improper discovery."
*See In re Cheney*, 334 F.3d 1096, 1105 (D.C. Cir. 2003) (internal quota-
tion marks omitted).

The district court nonetheless approved the discovery plan and directed
that the Vice President and White House officials either "fully comply
with" the discovery requests, "file detailed and precise objections to
particular requests," or "identify and explain their invocations of privilege
with particularity." *Id.* at 1000 (internal quotation marks omitted). The
Vice President petitioned the D.C. Circuit for a writ of mandamus vacat-
ing the discovery orders on the ground that the broad requests violated the

separation of powers by unduly interfering with the President's constitutional prerogatives, but the D.C. Circuit denied the petition. *See id.* at 1109.

The Supreme Court reversed and remanded for the D.C. Circuit to consider whether the discovery orders "constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390. In so holding, the Court rejected the lower courts' view that executive branch interests could have been adequately protected by "invoking executive privilege and filing objections to the discovery orders with 'detailed precision.'" *Id.* at 377 (quoting *In re Cheney*, 334 F.3d at 1105). The Court explained that "special considerations control" when White House staff and other high-level officials are the subject of civil discovery requests, and that separation of powers concerns might necessitate narrowing or denying requests for information directed to such officials before there should arise any need to consider invoking executive privilege. *See id.* at 385, 390. Because the information "requests [were] directed to the Vice President and other senior Government officials who served on the [Group] to give advice and make recommendations to the President," the broad discovery orders threatened to impinge on the Executive's "interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Id.* at 385. Therefore, the D.C. Circuit was obliged to consider whether allowing the requests to go forward would be "an unwarranted impairment" of the Executive Branch's discharge of its constitutional responsibilities. *Id.* at 390.

The Court's reasoning in *Cheney*, which instructs courts to consider the President's interests in autonomy and confidentiality when fashioning orders authorizing civil discovery directed at the White House, applies with at least equal force to congressional oversight requests for information from the White House. Both congressional oversight and civil litigation often concern wide-ranging information requests that involve the production of documents and the taking of testimony. Just as civil litigation against the "Vice President and other senior Government officials who . . . give advice and make recommendations to the President" does not entail "a routine discovery dispute," neither may congressional oversight of the White House be viewed as comparable to routine oversight of executive branch agencies. *Cf. Immunity of the Former Counsel*,

43 Op. O.L.C. __, at *4 ("[T]he President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies."). In both situations, far-reaching inquiries threaten presidential autonomy and confidentiality. Thus, the separation of powers concerns recognized in *Cheney* support significant limitations on the timing and scope of congressional oversight inquiries directed to the White House.

If anything, the concerns underlying the Court's decision in *Cheney* apply with even greater force to congressional inquiries. Congress is the President's constitutional "rival" in a manner distinct from the Judiciary. *Mazars*, 140 S. Ct. at 2033 (internal quotation marks omitted). When Congress conducts oversight, a neutral decision-maker is not readily available to appropriately balance each party's interests. And unlike the courts' express authority to order discovery, Congress's subpoena power is an implied adjunct to its legislative powers that is justified as "an essential and appropriate auxiliary to the legislative function." *Id.* at 2031 (quoting *McGrain*, 273 U.S. 174); *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (opinion of Roberts, C.J.) (implied powers under the Necessary and Proper Clause are "incidental" and cannot be "great substantive and independent powers" (internal quotation marks omitted)). A plaintiff in a civil action, moreover, may well have a greater need for documents and other information than a congressional committee conducting oversight. Congressional oversight gathers information so that Congress may "exercise its legislative function advisedly and effectively," *McGrain*, 273 U.S. at 161; *see also Mazars*, 140 S. Ct. at 2031–32, while the purpose of civil discovery is to disclose "the basic issues and facts" to "the fullest practicable extent," *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958). As the D.C. Circuit thus has recognized, "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability[] than on precise reconstruction of past events." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc). "[E]fforts to craft legislation involve predictive policy judgments that are not hampered in quite the same way when every scrap of potentially relevant evidence is not available [to Congress]." *Mazars*, 140 S. Ct. at 2036 (alterations and internal quotation marks omitted).

Furthermore, because Congress may not conduct oversight of the President's exclusive constitutional functions, legitimate congressional over-

sight inquiries will almost always pertain to executive branch implementation of statutory programs. But the departments and agencies, not the White House, principally administer such programs, and thus it is generally unnecessary for congressional committees to request information directly from the White House unless they are unable to obtain the information from agencies. As *Mazars* determined with respect to the President's personal information, to avoid unnecessary confrontation between the branches, "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs." *Id.* at 2035–36. That reasoning also applies to congressional requests for White House information. Because congressional oversight needs generally may be satisfied through requests to the departments and agencies, requests for information about programs administered outside the White House should be directed there in the first instance.

*Mazars* and *Cheney* are the latest in a line of judicial precedent recognizing the separation of powers concerns underlying litigation or related requests directed at the President. But the Supreme Court has long recognized that safeguarding presidential autonomy and confidentiality is critical to honoring the separation of powers. *See Cheney*, 542 U.S. at 385. This principle was first articulated in *United States v. Burr*, where Chief Justice John Marshall, sitting at trial as a Circuit Justice, stated that "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual." 25 F. Cas. 187, 192 (C.C. Va. 1807) (No. 14,694). In *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Court held that a sitting or former President is absolutely immune from civil actions for damages arising from his official acts. Underlying this bright-line rule is the rationale that "[b]ecause of the singular importance of the President's duties, diversion of his energies . . . would raise unique risks to the effective functioning of government." *Id.* at 751.[10] The Presi-

---

[10] The Supreme Court has held that presidential aides are generally treated differently from the President for purposes of immunity in civil litigation, receiving qualified immunity rather than absolute immunity. *Harlow*, 457 U.S. at 809. *But see id.* at 812 & n.19 (acknowledging that "[f]or aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest"). Yet that distinction is entirely consistent with *Cheney*'s holding that "special considerations" apply to civil discovery requests directed to White House officials and others who "give advice

dent's energies may be inappropriately diverted by congressional over-sight just as they may be by private litigation. *See Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *5 (explaining that permitting congression-al committees to compel the President's immediate advisers to testify would allow the committees to "harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain" and would force the advisers "to divert time and attention from their duties to the Presi-dent" (internal quotation marks omitted)).

In the oversight context, the President's interest in the White House's autonomy may be compromised not only by congressional inquiries that distract personnel and drain critical resources, but also by the potential "chilling effect" such demands would have on the interactions between the President and his advisers. *See Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C. __, at *2 (July 12, 2019) ("Congressional questioning of the President's senior advisers would . . . undermine the independence and candor of executive branch deliberations."). Intrusive congressional over-sight of the White House's interaction with departments and agencies may cause White House staff members to conform their information-gathering and policy-formulation processes to the demands of Congress instead of the needs of the President. Yet the President needs his staff to provide him with frank and candid judgments to "accomplish[] [his] constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. at 443. There is little doubt that intrusive oversight inquiries could chill and otherwise undermine these kinds of White House staff activities. *See Scope of Congressional Oversight*, 9 Op. O.L.C. at 62 ("Congress' power of inquiry must not be permitted to negate the President's constitutional

___

and make recommendations to the President." 542 U.S. at 385. As we have explained in declining to apply *Harlow* to narrow the traditional constraints governing the congres-sional testimony of senior presidential advisers, "the prospect of compelled congressional testimony raises separation of powers concerns that are not present in a civil damages lawsuit brought by a private party." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *13. Compelled congressional testimony "threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through a judicially monitored [proceeding] does not." *Id.* (internal quotation marks omitted).

responsibility for managing and controlling affairs committed to the Executive Branch.").

Closely related to the President's interest in securing the White House's autonomy is his interest in "safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. The Supreme Court has made clear that the President's interest in the confidentiality of his decision-making is a central component of the constitutional separation of powers. In *United States v. Nixon*, the Court stressed that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." 418 U.S. 683, 708 (1974). Although *Nixon* concerned a judicial demand for documents protected by executive privilege, this Office has long expressed the view that "[the] reasons for the constitutional privilege have at least as much force when it is Congress, instead of a court, that is seeking information." *Congressional Requests*, 13 Op. O.L.C. at 156. Indeed, "the prospect that predecisional deliberative communications will be disclosed to Congress is, if anything, more likely to chill internal debate among executive branch advisers than the possibility of disclosure to the judicial branch." Memorandum for Janet Reno, Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demands to Interview Prosecutors and Review Deliberative Documents in Closed Cases* at 14–15 (Nov. 23, 1993).[11] Because many White House

---

[11] As this Office has explained more fully:

> When the Supreme Court held that the need for presidential communications in the criminal trial of President Nixon's close aides outweighed the constitutional privilege, an important premise of its decision was that it did not believe that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution. By contrast, congressional requests for executive branch deliberative information are anything but infrequent. Moreover, compared to a criminal prosecution, a congressional investigation is usually sweeping; its issues are seldom narrowly defined, and the inquiry is not restricted by the rules of evidence. Finally, when Congress is investigating, it is by its own account often in an adversarial position to the executive branch and initiating action to override judgments made by the executive branch. This increases the likelihood that candid advice from executive branch advisers will be taken out of context or misconstrued.

*Congressional Requests*, 13 Op. O.L.C. at 156–57 (internal quotation marks and citations omitted).

staff members enjoy extensive access to the President, play important roles in developing presidential policy, and often serve as the President's alter ego, the President's interest in the confidentiality of White House activities must be afforded considerable weight in assessing the legitimacy of an exercise of Congress's oversight functions.

## B. Executive Privilege and White House Information

The heightened executive privilege interests that apply to White House communications provide an additional basis for distinguishing oversight inquiries directed at the White House from oversight of departments and agencies. Presidents have invoked executive privilege since the earliest days of the Republic, and the Supreme Court has recognized the privilege and held it to be an implied power under the Constitution. *See Nixon*, 418 U.S. at 705, 708; *see also id.* at 711 ("Nowhere in the Constitution . . . is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based."); *Congressional Requests*, 13 Op. O.L.C. at 154 (explaining that the existence of executive privilege is a "necessary corollary of the executive function vested in the President by Article II of the Constitution"). The Court has described the privilege as "deriv[ing] from the supremacy of each branch within its own assigned area of constitutional duties," "fundamental to the operation of Government," "and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 705, 708. The privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch," and, as a result, "information subject to executive privilege deserves the greatest protection consistent with the fair administration of justice." *Mazars*, 140 S. Ct. at 2032 (internal quotation marks omitted).

There are at least five well-recognized, and sometimes overlapping, components of executive privilege: national security and foreign affairs, law enforcement, deliberative process, attorney-client communications and attorney work product, and presidential communications. *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *8 & n.2 (May 23, 2019) ("*Exclusion of Agency Counsel*"); *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 8 (2008); *Executive Privilege: The With-*

*holding of Information by the Executive: Hearing on S. 1125 Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92nd Cong. 420 (1971) (statement of William Rehnquist, Assistant Attorney General, Office of Legal Counsel). Generally speaking, the national security and foreign affairs component provides *absolute* protection for materials the release of which would jeopardize sensitive diplomatic, national security, or military matters, including classified information and diplomatic communications.[12] Similarly, the law enforcement component of the privilege gives the Executive Branch a near-absolute right to withhold from Congress information that would compromise ongoing law enforcement activities.[13] Both of these components of executive privilege are deeply rooted in the Constitution and the Nation's history.

---

[12] *See, e.g.*, *Egan*, 484 U.S. at 527 (explaining that the President's "authority to classify and control access to information bearing on national security . . . flows primarily from th[e] constitutional investment of [the Commander in Chief] power in the President"); *United States v. Reynolds*, 345 U.S. 1, 10–11 (1953) (recognizing the national security component of the privilege in civil litigation involving military equipment); *In re United States*, 872 F.2d 472, 476 (D.C. Cir. 1989) (explaining that the privilege provides absolute protection for information the release of which would impair the Nation's defense, disclose intelligence activities, or disrupt diplomatic relations with foreign governments); *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982) (explaining that "matters the revelation of which reasonably could be seen as a threat to the military or diplomatic interests of the nation . . . are *absolutely privileged* from disclosure in the courts"); *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 97 (1998) ("[S]ince the Washington Administration, Presidents and their senior advisers have repeatedly concluded that our constitutional system grants the executive branch authority to control the disposition of secret information."); Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Access to Presidential Communications* at 2–11 (Dec. 21, 1989) (explaining the absolute scope of the national security component in the context of congressional investigations); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, and John R. Stevenson, Legal Adviser, Department of State, *Re: The President's Executive Privilege to Withhold Foreign Policy and National Security Information* at 7 (Dec. 8, 1969) ("[N]ational security and foreign relations considerations have been considered the strongest possible basis upon which to invoke the privilege of the executive."); *see also Nixon*, 418 U.S. at 706 (recognizing that executive privilege may be absolute "to protect military, diplomatic, or sensitive national security secrets").

[13] *See Temporary Certification Under the President John F. Kennedy Assassination Records Collection Act of 1992*, 41 Op. O.L.C. __ (Oct. 26, 2017); *Investigative Authority of the General Accounting Office*, 12 Op. O.L.C. 171, 177 (1988) ("With respect to open

Congressional inquiries to the White House more often implicate the deliberative process, the attorney-client communications and attorney work product, and particularly the presidential communications components of executive privilege. These components are also deeply rooted, and they protect from disclosure internal communications and information concerning presidential and other executive branch decision-making. They are based on the principle that the effective operation of the Executive Branch depends on shielding deliberative communications and advice from disclosure. *See Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. O.L.C. 481, 484–97 (1982) ("*Attorney General's Communications*").

The deliberative process component of executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" and protects all executive branch documents that reflect advisory opinions, recommendations, and other deliberative communications generated during governmental decision-making. *Mazars*, 140 S. Ct. at 2032; *see In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *see also Congressional Requests*, 13 Op. O.L.C. at 156–57 & n.3 (explaining the applicability of this component in the context of congressional requests for information). The deliberative process component is premised on the fact that disclosing the "communications and the ingredients of the decisionmaking process" would inevitably cause "injury to the quality of agency decisions" by inhibiting "'frank discussion of legal or policy

---

law enforcement files, it has been the policy of the executive branch throughout our Nation's history to protect these files from any breach of confidentiality, except in extraordinary circumstances."); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 75–78 (explaining the Executive Branch's authority to withhold open and closed law enforcement files from Congress); *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 117 (1984) ("Since the early part of the 19th century, Presidents have steadfastly protected the confidentiality and integrity of investigative files from untimely, inappropriate, or uncontrollable access by the other branches, particularly the legislature."); *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 32–33 (1982) (same concerning law enforcement files of the Environmental Protection Agency); *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 47 (1941) (same concerning investigative files of the Federal Bureau of Investigation).

matters.'" *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 151 (1975) (citation omitted). As the Supreme Court explained in *Nixon*:

> [There is a] valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.

418 U.S. at 705; *see also Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (explaining that the deliberative process component "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them" (internal quotation marks and citation omitted)). The deliberative process component of executive privilege applies especially strongly when the deliberations in question are ongoing. *See Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security*, 44 Op. O.L.C. __, at \*10–11 (Jan. 17, 2020) (*"Publication of Report on Imports"*). But the deliberative process component has certain limits: It protects predecisional and deliberative materials and typically does not "shield documents that simply state or explain a decision the government has already made or protect material that is purely factual." *Sealed Case*, 121 F.3d at 737. Agencies may withhold factual information only to the extent it is "so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Id.*

The attorney-client communications and attorney work product component of executive privilege protects executive branch communications and documents that involve legal analysis, legal advice, and other attorney communications or work product. *See Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) (Reno, Att'y Gen.) (recognizing that "[e]xecutive privilege applies" to certain documents "because of their deliberative nature, and

because they fall within the scope of the attorney-client privilege and the work-product doctrine"). Often, such communications will be protected by the deliberative process component in addition to the attorney-client and attorney work product component. Yet "'the reasons for the constitutional privilege against the compelled disclosure of executive branch deliberations have special force when legal advice is involved,'" because "'legal matters are likely to be among those on which high government officials most need, and should be encouraged to seek, objective, expert advice.'" *Attorney General's Communications*, 6 Op. O.L.C. at 490 n.17 (citation omitted); *see also Constitutionality of the OLC Reporting Act of 2008*, 32 Op. O.L.C. 14, 17 (2008) (Mukasey, Att'y Gen.) ("[I]f executive branch officials are to execute their constitutional and statutory responsibilities, they must have access to candid and confidential legal advice and assistance.").

The presidential communications component of executive privilege, which is the most salient component for White House purposes, protects communications made in connection with presidential decision-making. *See Nixon*, 418 U.S. at 708 (explaining importance of presidential communications privilege in government operations); *Sealed Case*, 121 F.3d at 746 (explaining that the "presidential [communications] privilege affords greater protection against disclosure" than the deliberative process privilege); Memorandum for the Attorney General from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: The Constitutional Privilege for Executive Branch Deliberations: The Dispute with a House Subcommittee over Documents Concerning the Gasoline Conservation Fee* at 13 (Jan. 13, 1981) ("*Executive Branch Deliberations*"). Although the presidential communications component applies only to presidential decision-making, it is broader than the deliberative process component in terms of the types of communications that are protected. *All* presidential communications are "presumptively privileged" and protected from disclosure, including post-decisional exchanges and documents conveying purely factual information. *Nixon*, 418 U.S. at 708, 713–14 (explaining that a presumptive privilege applies to the President's "conversations and correspondence"); *see also Sealed Case*, 121 F.3d at 745 ("[U]nlike the deliberative process privilege, the presidential communications privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative

ones."). In addition, this component of executive privilege covers communications between the President and agencies concerning presidential decision-making, including communications concerning the exercise of statutory authority. *See Publication of Report on Imports*, 44 Op. O.L.C. __, at *7–9.

The presidential communications component of executive privilege is not limited to exchanges directly involving the President. The Supreme Court emphasized in *Nixon* that the "President *and those who assist him* must be free to explore alternatives in the process of shaping policies and making decisions," 418 U.S. at 708 (emphasis added), and explicitly described the privilege as protecting communications within the President's "office," *id.* at 712–13. We have consistently recognized that for the President to obtain full, frank, and complete advice, the presidential communications component must apply to deliberations among the President's advisers and their staffs. *See, e.g.*, *Attorney General's Communications*, 6 Op. O.L.C. at 485–86 & n.11 (explaining that the presidential communications privilege protects the presidential "decisionmaking process" and, therefore, can apply to the work of presidential advisers).

The D.C. Circuit agreed in 1997, when it held that "communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President." *Sealed Case*, 121 F.3d at 751–52. In reaching this conclusion, the court, echoing the Supreme Court's analysis in *Nixon*, warned that "[i]f presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered, but ultimately rejected, they will almost inevitably be inclined to avoid serious consideration of novel or controversial approaches to presidential problems." *Id.* at 750. Excluding presidential advisers and their staffs from the presidential communications component would hinder the President's "access to honest and informed advice" and limit his "ability to explore possible policy options." *Id.* at 751. A narrower privilege would "impede . . . the presidency," *id.*, and diminish the quality of presidential decisions:

> Presidential advisers do not explore alternatives only in conversations with the President or pull their final advice to him out of thin air—if they do, their advice is not likely to be worth much. Rather,

the most valuable advisers will investigate the factual context of a problem in detail, obtain input from all others with significant expertise in the area, and perform detailed analyses of several different policy options before coming to closure on a recommendation for the Chief Executive. The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers.

*Id.* at 750.[14]

Against this backdrop, communications within the White House and between White House staff and other EOP components that concern possible presidential decision-making will normally fall under the presidential communications component of executive privilege, and not just the deliberative process or attorney-client communications and attorney work product components that apply to all government agencies and that are most commonly implicated when congressional committees make oversight requests of executive agencies. *See Executive Branch Deliberations* at 12 (concluding that "'presidential' communications . . . presumably [include] discussions among the President's aides and *officials in the Executive Office of the President*" (emphasis added)). Consequently, a congressional request for internal White House communications and intra-EOP communications will frequently implicate the presidential communications component of executive privilege. As a result, oversight directed at the White House will typically involve privilege interests that are, on the whole, considerably greater than those arising solely in the agency context, where other components are more commonly implicated.

---

[14] In *Judicial Watch, Inc. v. Department of Justice*, 365 F.3d 1108 (D.C. Cir. 2004), the D.C. Circuit in dictum construed *Sealed Case*'s use of the phrase "White House adviser" when describing the scope of the presidential communications privilege as restricting the privilege to the President's "immediate advisers in the Office of the President" (a component of the EOP also called the White House Office). *Id.* at 1123; *see id.* at 1109 n.1, 1116–17, 1123–24. This assumption misinterprets *Sealed Case*. Its explicit holding that communications by "presidential advisers" and "their staff" made "in the course of preparing advice for the President come under the presidential communications privilege" indicates that the privilege must encompass advisers in EOP entities outside the Office of the President whose primary function is to advise and assist the President. *See* 121 F.3d at 751–52.

## C. The Accommodation Process
## for Oversight of the White House

Given the President's interests in autonomy and confidentiality, the accommodation process will often lead to a different balance when applied to the White House as compared to the departments and agencies. It is long-standing executive branch policy that upon receipt of an authorized oversight request that is in furtherance of a legitimate legislative purpose, departments and agencies should "comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Memorandum for Heads of Executive Departments and Agencies from Ronald Reagan, *Re: Procedures Governing Responses to Congressional Requests for Information* at 1 (Nov. 4, 1982) ("Reagan Memorandum"). The manner of that compliance is determined by the operation of the accommodation process mandated by the Constitution, recognized by the Judicial Branch, and practiced by the Executive and Legislative Branches. "Historically, good faith negotiations between Congress and the Executive Branch have minimized the need for invoking executive privilege," and "this tradition of accommodation" has remained "the primary means of resolving conflicts between the Branches." *Id.*

The Supreme Court has also recognized that disputes over congressional demands for executive documents ordinarily "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 140 S. Ct. at 2029 (quoting *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel)). Since the Washington Administration, the Executive Branch has resisted congressional information demands that were overly burdensome or threatened to impair "the public good." *Id.* at 2029–30 (internal quotation marks omitted). Executive branch resistance, in turn, has often been met by congressional pressure, which was then followed by subsequent negotiations between the branches. In most instances, Congress and the Executive Branch have reached a compromise in which Congress might, for example, narrow the scope of its request or better articulate its needs, and

the Executive Branch might, for example, supply a subset of the requested documents, provide summaries of the information requested, or permit *in camera* review of particular documents. *Id.* This long-standing "tradition of negotiation and compromise" stands at the heart of the accommodation process. *Id.* at 2031.

In *AT&T*, the D.C. Circuit discussed the constitutional foundations for the accommodation process. 567 F.2d 121. There, the Department of Justice sought to enjoin AT&T from complying with a congressional subpoena that the Executive Branch believed implicated highly classified information, the disclosure of which would be detrimental to national security. The D.C. Circuit declined to decide the case on the merits and instead mandated a "procedure giv[ing] promise of satisfying the substantial needs of both [branches]." *Id.* at 123. The court stated:

> The framers . . . expect[ed] that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system. . . . [E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation.

*Id.* at 127. "[T]he resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system." *Id.* at 130.

In light of this history and precedent, both the Executive Branch and Congress have recognized their respective constitutional obligations to seek accommodation through good faith negotiations over their respective interests. *See, e.g.*, Elizabeth B. Bazan & Morton Rosenberg, Cong. Research Serv., *Congressional Oversight of Judges and Justices* 10 (May 31, 2005) ("Although the accommodation process between Congress and the Executive Branch is conducted in a highly political atmosphere, the arguments made by each side are usually grounded in legal doctrine and rely heavily on their interpretations and past experiences. At times, the Executive Branch is able to persuade Congress that a particular request is insufficiently weighty[.]"); *Congressional Requests*, 13 Op. O.L.C. at 159

("The process of accommodation requires that each branch explain to the other why it believes its needs to be legitimate. Without such an explanation, it may be difficult or impossible to assess the needs of one branch and relate them to those of the other."); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) (Smith, Att'y Gen.) ("The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch."). The accommodation process has usually proved successful in reconciling congressional informational needs with the Executive Branch's interests, and so congressional committees rarely pursue citing executive branch officials for contempt of Congress to enforce their document and testimonial subpoenas, *see infra* Part IV.A, and Presidents rarely invoke executive privilege.

Because the accommodation process is premised upon working out each branch's needs and interests, the outcome of that process may differ when it comes to the White House. As explained in Part I, the White House functions separately from the departments and agencies and historically has been "a combined administrative, advisory, planning, and policy-formulating office serving the President in an intimate, indispensable capacity." Clinton L. Rossiter, *The Constitutional Significance of the Executive Office of the President*, 43 Am. Pol. Sci. Rev. 1206, 1215 (1949). To a much greater degree than other parts of the Executive Branch, the White House serves to advise and assist the President, particularly in the discharge of his constitutional functions. Although there may be occasions when a congressional committee can appropriately seek information from the White House, particularly where the President is charged with the discharge of statutory functions, the separation of powers principles discussed above impose significant constraints on White House oversight, as reflected in long-standing practice.[15] The timing and

---

[15] *See, e.g.*, Letter for John W. Byrnes, House of Representatives, from Joseph Campbell, Comptroller General of the United States at 2 (Sept. 18, 1962) ("[W]e are certain you understand that [Comptroller General] investigations of White House activities are not subject to the same techniques as those conducted in the various departments and agencies. Files of the White House Office, with the exception of financial records, are normally not available to us. Also, White House personnel are not always available for interview. This has been the situation in all recent Administrations."); *see also* Cong. Research

scope of inquiries directed to the White House, and the accommodations offered by the White House, must be sensitive to the President's interests in autonomy and confidentiality, as well as the heightened confidentiality interests in White House communications. They also must reflect the different balance of needs and interests that applies to oversight of the White House: Congressional needs are often more attenuated (because it is the departments and agencies that administer most statutory programs), and the Executive Branch's institutional interests are greater (based on the President's need for autonomy and the heightened confidentiality interests).

As with all oversight requests, the White House may properly insist that a congressional committee articulate a legitimate legislative purpose for inquiries directed at the White House. *See Barenblatt*, 360 U.S. at 111–12; *Watkins*, 354 U.S. at 187. The committee's legislative purpose should be "carefully assess[ed]," whether or not the information sought is likely to be protected by executive privilege. *Mazars*, 140 S. Ct. at 2035. The White House should independently "examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *President's Tax Returns*, 43 Op. O.L.C. __, at *17. If the legitimate purpose underlying the oversight request appears unclear, White House staff may request that the committee clarify that purpose. *See id.* at *26 ("The separation of powers would be dramatically impaired were the Executive required to . . . accept[] the legitimacy of any reason proffered by Congress, even in the face of clear evidence to the contrary."). The White House must take care to ensure that the requests involve a legitimate legislative purpose

Serv., RL31351, *Presidential Advisers' Testimony Before Congressional Committees: An Overview* 21 (Dec. 15, 2014) ("Given the tradition of comity between the executive and legislative branches, Congress often elects not to request the appearance of presidential aides. When Congress has requested the appearance of such aides, Presidents and their aides have at times resisted, asserting the separation of powers doctrine and/or executive privilege." (footnote omitted)); Louis Fisher, *White House Aides Testifying Before Congress*, 27 Presidential Stud. Q. 139, 151 (1997) ("The White House is usually insulated from congressional inquiry because of a long-standing comity that exists between Congress and the presidency. By and large, each branch concedes a certain amount of autonomy to the other. Only in clear cases of abuse and obvious bad faith will Congress insist that White House aides appear and give an account of their activities.").

and do not intrude upon the exclusive constitutional prerogatives of the President.

In addition, because any congressional inquiry must respect the "autonomy" of the President's close advisers and "the confidentiality of [their] communications," *Cheney*, 542 U.S. at 385, a congressional committee seeking information about a statutory program should generally be directed first to the agency that administers the program in question. *See Mazars*, 140 S. Ct. at 2035–36 (explaining that "[o]ccasion[s] for constitutional confrontation between the two branches should be avoided whenever possible" and that "Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs" (internal quotation marks omitted)). This practice of exhaustion is rooted in separation of powers principles and the practical realities of White House operations. It is crucial to the functioning of the Executive Branch that White House staff members be able to perform their functions independently and effectively in service of the President. Congressional efforts to conduct extensive and time-consuming oversight of the White House could seriously interfere with that mission. When information Congress seeks is available from an agency, there is no reason to subject the President's advisers to potentially burdensome oversight requests, especially because aspects of their work are far more likely to implicate the presidential communications component of executive privilege.[16]

Accordingly, when faced with a congressional request for information that reasonably could be acquired from a department or agency, White House staff often advise the relevant committee that it should pursue its request there. Only if the committee has exhausted the possibility of obtaining the necessary information elsewhere, and has determined that the necessary information may be obtained only from the White House, should the committee direct its inquiry to the White House.

---

[16] Courts have credited these concerns in a series of cases discussing FOIA requests. The D.C. Circuit, for instance, has declined to allow FOIA requests for the President's White House visitor logs—even though the logs were held by the Secret Service, which is housed within the Department of Homeland Security, rather than the White House—because such requests "could render FOIA a potentially serious congressional intrusion into the conduct of the President's daily operations." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d at 226.

When a committee's request to the White House concerns statutory functions, is within the committee's delegated oversight authority, and rests on a legitimate legislative purpose—and after the committee has attempted to seek such information from any relevant agencies—then the White House should consider how to accommodate the committee's needs in a manner consistent with the interests of the Executive Branch. *See AT&T*, 567 F.2d at 127. An important feature of the accommodation process is the dialogue that takes place between the committee and the White House to ensure that information requests are not "unnecessarily broad." *Cheney*, 542 U.S. at 390. Given the separation of powers principles at stake, these negotiations can help "narrow the scope of possible conflict between the branches," and ensure that a request is "no broader than reasonably necessary to support Congress's legislative objective." *Mazars*, 140 S. Ct. at 2036.

The accommodation process has several rules of the road. First, the White House may properly demand that Congress's request be reasonably specific. "The specificity of [a committee's] request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Id.* (quoting *Cheney*, 542 U.S. at 387). A committee should clearly explain the nature and scope of its request and provide the White House with an opportunity to seek further explanation if the White House believes that the request is vague or otherwise ambiguous. Second, the "burdens imposed by a congressional [request] should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas [or other requests] for institutional advantage." *Id.* Finally, given the relatively small staff and resources available in the White House, the committee must afford the White House sufficient time to respond to its inquiry and flexibility in its manner and mode of response.

In light of these considerations, the White House typically seeks to accommodate congressional requests by providing written responses or oral briefings on relevant activities or policies, supplemented sometimes by the production of specific non-privileged documents. The White House does not ordinarily undertake the burden of reviewing and producing e-mails and other documents, which generally will consist primarily of deliberative communications within the White House or between the

White House and other parts of the Executive Branch. Searching through and processing the thousands of presumptively privileged e-mails likely to be responsive to a single request undoubtedly would divert the relatively small White House staff from its important work for the President. Further, the practice of providing written responses and oral briefings instead of e-mails and other internal communications helps preserve the President's ability to obtain full and frank advice from White House staff. This is critical to avoid chilling the candor of White House communications, since "[t]he President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers." *Sealed Case*, 121 F.3d at 750.

Such responses and briefings, in lieu of documents, are generally sufficient to satisfy the legitimate information needs of congressional committees. As noted above, because the purpose of oversight is to enable Congress to "exercise its legislative function advisedly and effectively," *McGrain*, 273 U.S. at 161, rarely do the "legislative judgments" informed by the oversight process depend on a "precise reconstruction of past events," *Senate Select Comm.*, 498 F.2d at 732; *see Mazars*, 140 S. Ct. at 2036; *Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at *10. Moreover, "'Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.'" *Congressional Requests*, 13 Op. O.L.C. at 159 (citation omitted). Although in appropriate circumstances agencies may offer the accommodation of access to deliberative materials (permitting them to be read but not copied, for example), such an accommodation would be quite unusual for internal White House and intra-EOP deliberative communications because of the President's unique need for autonomy and heightened confidentiality interests.

## IV. Congressional Subpoenas to the White House

We next turn to consider the procedures by which congressional committees may issue and seek to enforce subpoenas. Drawing on the constitutional principles discussed in the prior Parts, we outline some of the grounds on which the Executive Branch has commonly objected to the scope or enforceability of congressional subpoenas.

## A. Issuance and Enforcement of Subpoenas

Congress's subpoena power is inherent in its investigative authority. *See Mazars*, 140 S. Ct. at 2031; *U.S. Servicemen's Fund*, 421 U.S. at 504 (observing that the issuance of subpoenas "has long been held to be a legitimate use by Congress of its power to investigate"); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 81–82 (discussing congressional authority to issue subpoenas). Because the authority to issue subpoenas is an inherent constitutional power, Congress does not need statutory authorization to issue a subpoena, but any "exercise of subpoena power must be authorized by the relevant House." *Independent Counsel Act Requests*, 10 Op. O.L.C. at 82 (citing *Reed v. Cty. Comm'rs*, 277 U.S. 376, 389 (1928); *McGrain*, 273 U.S. at 158); *see also Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at *19 ("a committee's authority to compel the production of documents and testimony depends entirely upon the jurisdiction provided by the terms of the House's delegation").

The Senate rules provide committees with the authority to subpoena witnesses, "correspondence, books, papers, and documents," Senate Rule XXVI(1), and similarly the rules of the House of Representatives authorize committees to subpoena "witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as [they] consider[] necessary," House Rule XI.2(m)(1)(B). The precise procedures for issuing a subpoena vary depending on the rules of the chamber and committee involved. *See* Michael L. Koempel, Cong. Research Serv., R44247, *A Survey of House and Senate Committee Rules on Subpoenas* 5–16 (Jan. 29, 2018) ("*Survey of Committee Rules*") (detailing House and Senate chamber and committee rules on subpoena procedures). In the House, subpoenas generally may be issued by a committee "only when authorized by the committee . . . , a majority being present," but committees may delegate that power to "the chair of the committee under such rules and under such limitations as the committee may prescribe." House Rule XI.2(m)(3)(A)(i); *see also Survey of Committee Rules* at 1 ("[m]ost House committees" have delegated subpoena power to their chairs). The Senate's standing rules delegate to each committee responsibility for establishing subpoena procedures, and the procedures vary widely. *See* Senate Rule XXVI(2).

During Watergate and on several occasions more recently, congressional committees have turned to the federal courts seeking the enforcement of subpoenas against executive branch officials. This is a marked departure from long-standing practice: "Historically, disputes over congressional demands for presidential documents have not ended up in court." *Mazars*, 140 S. Ct. at 2029; *see Comm. on the Judiciary v. McGahn*, 968 F.3d 755, 777 (D.C. Cir. 2020) (en banc) (noting that "there have been relatively few" such cases). The Supreme Court has recognized that "Congress and the Executive have nonetheless managed for over two centuries to resolve" privilege disputes without recourse to the Supreme Court. *Mazars*, 140 S. Ct. at 2031. And although *Mazars* arose in an unusual posture that made it justiciable—because the President in his personal capacity sought to require his accountants to comply with their confidentiality obligations—that case was the first such dispute to reach the Supreme Court. *See id.* ("we have never considered a dispute over a congressional subpoena for the President's records").

In recent decades, the Department of Justice has maintained that a congressional suit to enforce a subpoena against the Executive Branch is not justiciable.[17] First, such a lawsuit typically alleges an abstract "type of institutional injury (the diminution of legislative power)" that does not constitute a "'concrete and particularized'" legal injury as required for Article III standing—a doctrine that applies "especially rigorous[ly]" in separation of powers cases. *Raines v. Byrd*, 521 U.S. 811, 819–21 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Second, as noted above, such suits were nearly unprecedented as a historical matter, despite the history of oversight disputes between Congress and the Execu-

---

[17] Although a congressional committee may not seek judicial enforcement of a subpoena against the Executive Branch, there are some cases, such as *Mazars*, where a suit involving a congressional subpoena would be justiciable. The dispute there no doubt presented "significant separation of powers issues" and was in meaningful respects an inter-branch dispute, 140 S. Ct. at 2033–34, but as noted, it involved the President's private right in his personal papers and the legal obligations owed to him by third parties that were the actual recipients of the subpoenas, *see id.* at 2027–28; *see also Comm. on the Judiciary v. McGahn*, 951 F.3d 510, 531 (D.C. Cir. 2020) ("we may adjudicate cases concerning congressional subpoenas if they implicate the rights of private parties"), *vacated on reh'g en banc*, 968 F.3d 755; *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 390–91 (D.C. Cir. 1976) (holding that an executive branch suit to enjoin a third party from complying with a congressional subpoena was justiciable).

tive Branch going back to the First Congress, and thus are not "'traditionally thought to be capable of resolution through the judicial process.'" *Id.* at 819 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)); *see also Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008) ("history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider"). It was not until 1974—almost two centuries after the Constitution's ratification—that a committee of Congress appears to have first brought a civil action attempting to compel executive branch compliance with a subpoena. *See Senate Select Comm.*, 498 F.2d 725. In that case, a statute purported to give the District Court for the District of Columbia jurisdiction in "any civil action" brought by the Senate committee investigating the Watergate scandal to "enforce and secure a declaration concerning the validity of any subpoena." Pub. L. No. 93-190, § (a), 87 Stat. 736, 736 (1973); *see also Senate Select Comm.*, 498 F.2d at 727–28 (explaining the jurisdiction conferred by the special law). The court of appeals did not address whether the case was justiciable as a constitutional matter. No committee of Congress brought a subpoena-enforcement action again until 2008, when House committees began filing such suits with some regularity.[18]

Earlier this year, a panel of the D.C. Circuit agreed with the Department and dismissed a congressional suit seeking enforcement of a subpoena to the former Counsel to the President. *Comm. on the Judiciary v. McGahn*, 951 F.3d 510 (D.C. Cir. 2020), *vacated on reh'g en banc*, 968 F.3d 755. The panel concluded that "separation-of-powers principles and historical practice" bar federal courts from exercising jurisdiction over committee suits "to enforce a congressional subpoena against the Executive Branch." *Id.* at 522. The court reheard the case en banc and vacated that ruling, holding that congressional committees could assert informational injuries no less than private parties because the constitutional separation of powers erects no "structural barrier to judicial involvement in informational disputes between the elected branches." *McGahn*, 968

---

[18] *See* Complaint for Declaratory and Injunctive Relief, *Comm. on the Judiciary v. Miers*, No. 08-0409 (D.D.C. Mar. 10, 2008); Complaint, *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-1332 (D.D.C. Aug. 13, 2012); Complaint for Declaratory and Injunctive Relief, *Comm. on the Judiciary v. McGahn*, No. 19-2379 (D.D.C. Aug. 7, 2019); Complaint for Declaratory and Injunctive Relief, *Comm. on Oversight & Reform v. Barr*, No. 19-3557 (D.D.C. Nov. 26, 2019).

F.3d at 768. *But see id.* at 783–84 (Griffith, J., dissenting) (faulting the majority for "its neglect of the interbranch nature of this dispute"). On remand, however, the panel held that congressional committees nonetheless lack a cause of action to seek judicial enforcement of a subpoena in this context. *McGahn*, 973 F.3d 121 (D.C. Cir. 2020), *reh'g en banc granted*, No. 19-5331 (Oct. 15, 2020).

As the panel recognized, even if congressional suits to enforce subpoenas to the Executive Branch were justiciable, they fall outside the statutory jurisdiction of the federal courts and are unsupported by any cause of action. Although committees have relied upon the federal-question statute, 28 U.S.C. § 1331, as a basis for subject-matter jurisdiction, a more specific statute governs jurisdiction over congressional subpoena-enforcement suits, *id.* § 1365(a). This latter statute provides jurisdiction only for Senate actions, and more importantly excludes all actions to enforce subpoenas against executive branch officials who raise "a governmental privilege." *Id.*; *see McGahn*, 951 F.3d at 522 ("The obvious effect of section 1365(a)'s carve-out is to keep interbranch information disputes like this one out of court."). Indeed, the carve-out sought to accommodate the Executive Branch's view, expressed by then-Assistant Attorney General Scalia, that "the Supreme Court should not and would not undertake to adjudicate the validity of the assertion of executive privilege against the Congress." *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 83 (1975) (statement of Assistant Attorney General Scalia); *see also id.* at 84 ("[T]he courts are precisely not the forum in which this issue should be resolved.").

Moreover, in addition to lacking a statutory basis for jurisdiction, House committees lack any cause of action to enforce their subpoenas. The statute that provides a cause of action to enforce Senate subpoenas, 2 U.S.C. § 288d, like section 1365(a), applies only to the Senate (and imposes various restrictions). That limitation (among other considerations) also makes clear, as the *McGahn* panel explained, that neither an implied cause of action under Article I of the Constitution nor an equitable cause of action is available to the House in this context. *See* 973 F.3d at 123–24; *see also id.* at 124–25 (applying Supreme Court and circuit precedent to reject the argument that the Declaratory Judgment Act, 28

U.S.C. § 2201, provides a cause of action). As the Supreme Court has recognized, Congress's authority "to compel production of evidence differs widely from authority to invoke judicial power for that purpose." *Reed*, 277 U.S. at 389.

In the 1980s, this Office opined that these civil suits do lie within the constitutional and statutory jurisdiction of the federal courts and are appropriate for judicial resolution. *See Independent Counsel Act Requests*, 10 Op. O.L.C. at 87–89; *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 137 (1984) ("*Prosecution for Contempt of Congress*").[19] But those statements preceded significant decisions in which the Supreme Court clarified the requirements of Article III standing (most notably *Raines v. Byrd* ) and amendments to 28 U.S.C. § 1365(a) enacted in 1996 that confirm Congress's intent to bar inter-branch informational disputes from federal court. *See McGahn*, 951 F.3d at 522 (discussing 1996 legislative history). In fact, the author of one such OLC opinion, Assistant Attorney General Theodore Olson, argued while later serving as Solicitor General that these developments in the law undermined the Department's earlier view. *See* Defendant's Memorandum of Points & Auths. in Reply to Plaintiff's Opposition to Motion to Dismiss, *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002) (No. 02-340), 2002 WL 32388026 (relying on *Raines* to argue that a suit brought by the Comptroller General against executive branch officials was nonjusticiable). This Office was consulted on that brief at the time, and we continue to think that these developments in the law support the Department's current view that Congress may not properly seek to enforce its subpoenas in federal court against executive branch officials.

Congress has increasingly turned to civil enforcement suits as an alternative to traditional efforts to compel executive branch officials to provide information that Congress has requested. Historically, Congress has had no shortage of ways to use its powers to press executive branch officials to negotiate and to comply with appropriate informational de-

---

[19] The Department of Justice even attempted to bring an analogous suit against the House in 1983. *See United States v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) (dismissing, on prudential grounds, a suit seeking a declaratory judgment that the Administrator of the Environmental Protection Agency had lawfully withheld privileged documents from Congress).

mands. Congress has the power of the purse, *see* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"), as well as the power to impeach and remove executive officers, *see id.* § 2, cl. 5; *id.* § 3, cls. 6–7, and the Senate's consent is necessary for the appointments of many senior executive officers, *see id.* art. II, § 2, cl. 2. Congress also may press its case directly to the press and to the public at large. Those powers have frequently been deployed as a means of ensuring that the Executive Branch acts in accord with the "tradition of negotiation and compromise," *Mazars*, 140 S. Ct. at 2031, that has led to the successful resolution of many oversight disputes.

Congress also has other, more direct means of ensuring compliance with subpoenas. One theoretical option would be for the House or Senate to invoke its inherent contempt powers and instruct the Sergeant-at-Arms to arrest an individual cited for contempt. *See Jurney v. MacCracken*, 294 U.S. 125 (1935); *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821). However, Congress has not sought to arrest any person for contempt in more than 80 years, *see Independent Counsel Act Requests*, 10 Op. O.L.C. at 86, and has not sought to arrest an executive branch official in more than a century, *see McGahn*, 968 F.3d at 776. Any effort by Congress to arrest a White House official for noncompliance with a subpoena based upon a legitimate separation of powers objection would, besides raising serious practical concerns, likely be unconstitutional. *See Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *20–21 ("The constitutional separation of powers bars Congress from exercising its inherent contempt power in the face of a presidential assertion of executive privilege. An attempt to exercise inherent contempt powers in such a circumstance would be without precedent and would immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." (internal quotation marks omitted)). Congressional authority to arrest executive officials for actions properly taken to protect the prerogatives of the Executive Branch is the type of "great substantive and independent power[]" that the Constitution would not have left to mere implication. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 559 (opinion of Roberts, C.J.) (internal quotation marks omitted).

To complement its inherent contempt power, Congress in the mid-nineteenth century enacted a criminal statute to prohibit defiance of a

congressional subpoena. *See* 2 U.S.C. § 192. Under the statute, where a person who is summoned to give testimony or to produce papers and "willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry," *id.*, the President of the Senate or the Speaker of the House may refer to an "appropriate United States attorney" for prosecution an individual who refuses to comply with a subpoena. *Id.* § 194. Congress has invoked the criminal contempt statute against private parties and executive branch officials as well.

We have long maintained, however, that the contempt statute does not apply to executive branch officials who resist congressional subpoenas in order to protect the prerogatives of the Executive Branch. *See Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 129–42. Moreover, given that the prosecution authority is part of the executive power, Congress may only *refer* an individual to a United States Attorney for a contempt prosecution; the Department of Justice ultimately has the prosecutorial discretion to decide whether a person should be indicted and prosecuted. *See Nixon*, 418 U.S. at 693 ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 119–20 (Department of Justice controls whether any contempt prosecution will be brought). In response to criminal referrals for two White House officials in 2008, for instance, Attorney General Michael Mukasey notified the Speaker of the House that the Department of Justice would "not bring the congressional contempt citations before a grand jury or take any other action to prosecute," because, in light of the President's assertions of executive privilege, the "non-compliance by [the President's Chief of Staff] and [the former Counsel to the President] . . . did not constitute a crime." Letter for Nancy Pelosi, Speaker of the House, from Michael B. Mukasey, Attorney General at 2 (Feb. 29, 2008); *see also Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 128 (contempt statute does not override the Executive's prosecutorial discretion); *Prosecutorial Discretion Regarding Citations for Contempt of Congress*, 38 Op. O.L.C. 1, 2–3 (2014) (same).

Congressional committees have generally sought enforcement of subpoenas against noncompliant witnesses only with an authorization from the *full* House or Senate. *See* 2 U.S.C. § 288b(b) (requiring "adoption of a resolution by the Senate" to authorize a Senate subpoena-enforcement

suit); House Rule XI.2(m)(3)(C) ("Compliance with a subpoena issued by a [House] committee or subcommittee . . . may be enforced only as authorized or directed by the House."); Cong. Research Serv., RL30548, *Hearings in the U.S. Senate: A Guide for Preparation and Procedure* 11 (Mar. 18, 2010) ("Compliance with a [Senate committee] subpoena can be enforced only at the direction of the Senate."); *Independent Counsel Act Requests*, 10 Op. O.L.C. at 82–83 (discussing procedures for enforcing House subpoenas).[20] If the committee seeks to enforce the subpoena by holding the recipient in contempt, the committee (by a majority vote) must seek such approval by "report[ing] a resolution of contempt to the floor." Louis Fisher, Cong. Research Serv., *Congressional Investigations: Subpoenas and Contempt Power* 7 (Apr. 2, 2003) ("*Subpoenas and Contempt Power*"); *see also* 2 U.S.C. § 194 (requiring, for a contempt of Congress prosecution, that noncompliance with a subpoena be reported to the House or Senate, or House or Senate leadership if Congress is not in session). The full House or Senate must then "vote in support of the contempt citation" before the contempt may be referred to the U.S. Attorney. *Subpoenas and Contempt Power* at 7; *see also Wilson v. United States*, 369 F.2d 198, 203 (D.C. Cir. 1966) (explaining that a chamberwide vote provides "a 'check' on hasty action by a committee" and avoids a situation where "the allegedly insulted committee . . . provide[s] the sole legislative determination whether to initiate proceedings to prosecute for contempt").

Committees of Congress have issued and likely will continue to issue subpoenas for documents and testimony to White House personnel. Less certain, however, is whether congressional entities have any authority to seek to compel compliance with such subpoenas in court. We believe that congressional suits to enforce subpoenas to executive branch officials fall outside the constitutional and statutory jurisdiction of the federal courts;

---

[20] Where recourse has been made to the courts, the House or Senate has typically authorized such an action by resolution. Todd Garvey, Cong. Research Serv., R45653, *Congressional Subpoenas: Enforcing Executive Branch Compliance* 5 (Mar. 27, 2019); *see, e.g.*, H.R. Res. 706, 112th Cong. (2012) (authorizing suit to enforce subpoena to Attorney General Holder). In the 116th Congress, however, the House broke from this practice by adopting a resolution enabling committees to file suit whenever authorized by the Bipartisan Legal Advisory Group, H.R. Res. 430 (2019), which comprises the House Speaker and majority and minority leaderships, House Rule II.8(b).

the inherent contempt mechanism appears to have fallen into desuetude, and would present grave constitutional concerns if deployed against executive branch officials acting to protect the lawful prerogatives of the Executive; and the Executive Branch has discretion to refuse to bring a contempt of Congress criminal prosecution against one of its officials in such circumstances.

## B. Validity of Subpoenas Issued to the White House

It is the Executive Branch's settled policy to work to accommodate congressional requests for information in a manner consistent with the Executive's constitutional and statutory obligations. Historically, however, congressional subpoenas to executive branch officials have raised a variety of separation of powers concerns. This section identifies and discusses a number of legal defects, several of which are discussed at greater length above, that have commonly arisen in subpoenas involving the White House. These limitations on Congress's oversight powers are rooted in the separation of powers, and observing them serves to prevent Congress from "aggrandiz[ing] itself at the [Executive's] expense." *Mazars*, 140 S. Ct. at 2034.

*Lack of Oversight Authority or Legitimate Legislative Purpose.* As we have discussed, all congressional oversight inquiries must be conducted in support of Congress's legislative authority under Article I of the Constitution. *See id.* at 2031–32, 2035–36; *McGrain*, 273 U.S. at 177. A subpoena that seeks material or testimony on matters beyond Congress's legislative authority, such as the exercise of a constitutional power vested exclusively in the Executive Branch, is beyond Congress's oversight authority. *See Barenblatt*, 360 U.S. at 111–12.

*Infringement of Presidential Autonomy and Confidentiality.* Congressional inquiries to the White House are constrained by "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Cheney*, 542 U.S. at 385. In certain circumstances, compliance with a congressional subpoena directed at the White House may unduly impair the Executive's "ability to discharge its constitutional responsibilities." *Id.* at 382. For example, compliance with a subpoena that is excessively broad or intrusive might burden White House personnel to a degree that prevents them from effec-

tively advising and assisting the President in the performance of his constitutional duties. In that circumstance, it would be unconstitutional to enforce such an unduly broad subpoena. Of course, the accommodation process serves to ensure that congressional requests are tailored or narrowed so as to avoid infringement of presidential autonomy and confidentiality while satisfying Congress's legitimate needs for relevant information.

***Immunity of White House Officials from Compelled Testimony.*** Relatedly, the White House has consistently resisted subpoenas that seek to compel the President's immediate advisers to testify before congressional committees. The White House has declined to make many of the President's immediate advisers available since the establishment of the EOP, and for almost 50 years, the Department of Justice has articulated this position as a legal immunity—that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *3 (internal quotation marks omitted).[21] As Assistant Attorney General Rehnquist explained:

> The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum for John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971); *see also Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *7–

---

[21] Although this Office has spoken of this protection from compelled congressional testimony in terms of "immunity," it may equally be viewed as a limitation on the breadth of Congress's implied power to compel testimony. *Cf. New York v. United States*, 505 U.S. 144, 159 (1992) ("it makes no difference whether one views" a federalism question as turning upon "the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution" or the scope of the "sovereignty retained by the States under the Tenth Amendment").

11 (listing historical examples of immediate presidential advisers refusing to testify); Letter for Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, att. at 6 (Sept. 25, 1974) ("at least since the Truman Administration," presidential advisers "have appeared before congressional committees only where the inquiry related to their own private affairs or where they had received Presidential permission").

Consequently, in addition to invoking executive privilege over particular questions, the President "can also direct them not even to appear before the committee." Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* app. at 7 (Aug. 11, 1977). For example, in 1981, Martin Anderson, President Reagan's assistant for policy development, refused to appear before a House appropriations subcommittee responsible for funding his office. White House Counsel Fred F. Fielding explained that "[f]rom the Administration of George Washington to the present day, it has been a central tenet of the doctrine of separation of powers among the three branches of the Federal Government that the President is not subject to questioning as to the manner in which he formulates Executive policy"; this principle "founded in practicality as well as tradition and law" "has also been applied to senior members of the President's personal staff, who participate in the deliberative process through which such policies are developed." Letter for Edward R. Roybal, Chairman, Subcommittee on Treasury, Postal Service, General Government, U.S. House of Representatives, from Fred F. Fielding, Counsel to the President (July 8, 1981), *reprinted in* H.R. Rep. No. 97-171, at 61 (1981). This testimonial immunity safeguards the constitutional separation of powers by protecting the independence and autonomy of the Presidency from congressional interference; it also "protects the Executive Branch's strong interests in confidentiality as well as the President's ability to obtain sound and candid advice." *Immunity of the Former Counsel*, 43 Op. O.L.C. __, at *5; *accord Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. 5, 7–9 (2014).

Immediate advisers to the President remain immune from compelled testimony about their official duties in that capacity even after they leave the White House. *See Immunity of the Former Counsel*, 43 Op. O.L.C. __,

at \*15–16 (explaining that "the risk to the separation of powers and to the President's autonomy posed by a former adviser's testimony on official matters continues after the conclusion of that adviser's tenure"). In determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President. Although most members of the White House staff do not qualify for immunity from compelled testimony, as a matter of policy the White House has generally opposed making any members of the White House staff available to testify, subject to the accommodation process.

The Executive Branch's position on immunity is well established by our precedent and practice, but the federal courts have looked less favorably on this position in the two cases in which the House sought to test it in court. The district courts to consider the question have held that senior presidential advisers do not, at least as a categorical matter, enjoy absolute immunity from compelled congressional testimony. *See Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 105–06 (D.D.C. 2008); *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 200–14 (D.D.C. 2019). But the first of those decisions was stayed pending appeal, *Comm. on the Judiciary v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) (per curiam), and then settled without enforcement of the subpoena, 2009 WL 3568649 (D.C. Cir. Oct. 14, 2009). The second decision remains under review in the D.C. Circuit. In the latter case, two judges sitting on the D.C. Circuit panel similarly expressed doubt about the existence of this absolute immunity. *See McGahn*, 951 F.3d at 538–42 (Henderson, J., concurring); *id.* at 558 (Rogers, J., dissenting). No precedential ruling has addressed the Executive Branch's position, however, which for decades has governed the Executive Branch's negotiations with congressional committees seeking the testimony of the President's immediate advisers.

***Exclusion of Counsel from Depositions.*** Although historically Congress has sought to obtain testimony from executive branch officials by means of voluntary interviews and public hearings, committees in recent years have made increasing use of depositions. *See, e.g.*, H.R. Res. 6, 116th Cong. § 103(a)(1) (2019) (authorizing committee chairs to "order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee"). And certain committees, based on the current House rules governing depositions, have attempted to bar executive

branch witnesses from being accompanied by agency counsel at their depositions, allowing only private counsel. 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) ("counsel for government agencies . . . may not attend"); *see also, e.g.*, H. Comm. on Oversight & Reform Rule 15(e), 116th Cong. (2019) (counsel "for agencies under investigation . . . may not attend"). The Executive Branch has repeatedly resisted this practice and sought to maintain the "[l]ongstanding Executive Branch policy and practice" of agency counsel accompanying agency officials when they are questioned by Congress. Letter for Henry Waxman, Chairman, Committee on Oversight and Government Reform, U.S. House of Representatives, from Dinah Bear, General Counsel, Council on Environmental Quality at 2 (Mar. 12, 2007).

This Office has advised that barring agency counsel from congressional depositions is unconstitutional because it "compromise[s] the President's constitutional authority to control the disclosure of privileged information and to supervise the Executive Branch's communications with congressional entities." *Exclusion of Agency Counsel*, 43 Op. O.L.C. __, at *2; *see also Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. __, at *5 n.6 (Jan. 18, 2017) (noting that excluding agency counsel may raise "constitutional concerns" but reserving the question). This principle of course applies to depositions of White House officials. In *Exclusion of Agency Counsel*, for example, we advised that a subpoena issued by the House Committee on Oversight and Reform to the former head of the White House Personnel Security Office was invalid on this basis. *See* 43 Op. O.L.C. __, at *2, *6. Subpoenas requiring White House personnel to testify without agency counsel are therefore without legal effect and may not constitutionally be enforced, civilly or criminally, against their recipients. *See id.* at *13–14.

***Failure to Exhaust the Accommodation Process.*** The White House often has responded to congressional requests by insisting that committees engage in the accommodation process. *See supra* Part III.C. A congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena before the accommodation process has run its course. Thus, White House officials have often cited a committee's failure to exhaust the accommodation process in objecting to a congressional subpoena.

The accommodation process encompasses the exhaustion principle that we have discussed above. The White House may object to a committee's refusal to seek necessary information from the relevant executive branch departments and agencies before directing requests to the White House. *See Mazars*, 140 S. Ct. at 2035–36 ("Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective."). Where a committee declines to honor its obligation to accommodate the legitimate needs of the White House, the committee may not lawfully begin the contempt process based upon good faith objections raised by White House officials.

*Assertion of Executive Privilege.* An assertion of executive privilege authorized by the President is a well-established ground for resisting a congressional subpoena. *See id.* at 2032 ("recipients [of legislative subpoenas] have long been understood to retain common law and constitutional privileges with respect to certain materials, such as . . . governmental communications protected by executive privilege"). Executive privilege consists of several components, which vary in scope and the extent of protection from disclosure. *See supra* Part III.B. As relevant to the White House, a congressional committee may overcome an assertion of executive privilege based on the presidential communications component of the privilege only by "demonstrat[ing] that the information sought is 'demonstrably critical to the responsible fulfillment of the Committee's functions.'" *Assertion of Executive Privilege for Documents Concerning Conduct of Foreign Affairs with Respect to Haiti*, 20 Op. O.L.C. 5, 6 (1996) (Reno, Att'y Gen.) (quoting *Senate Select Comm.*, 498 F.2d at 731). White House officials have an obligation to minimize the disclosure of privileged information and to protect the President's authority to determine when it would be in the public interest to provide such information as an accommodation.

This is not to say that the Executive Branch must or should claim executive privilege as a prerequisite to asserting any confidentiality interests in connection with congressional oversight. A formal assertion of executive privilege is a last resort in the sense that it is typically only needed when the Executive Branch has already asserted its confidentiality interests, but the accommodation process has failed to produce a resolution and the relevant committee moves to initiate enforcement action by voting

to recommend that the recipient of the subpoena be cited for contempt of Congress.[22] However, a formal assertion of privilege does not preclude the possibility of further negotiation and accommodation.

***Unreasonable Burden to Comply.*** White House officials also may decline to comply fully with the terms of a subpoena based on a concern that compliance would be unreasonably burdensome or impossible. Compared to the departments and agencies, White House components have small staffs who are primarily devoted to advising and assisting the President. Exempt from FOIA, these White House components do not have trained standing units devoted to document review and response work. Instead, these White House components need to divert staff from their work for the President to process congressional oversight requests. The White House is thus less likely than other parts of the Executive Branch to have the resources available to comply fully with subpoenas that are broad in scope and have urgent return dates.

The federal courts' rules of procedure for both civil and criminal cases relieve parties of the obligation to comply with a subpoena where the scope of the request and the return date make compliance unreasonably burdensome or impossible. *See* Fed. R. Civ. P. 45(d)(3)(A) (court "must quash or modify a subpoena that . . . fails to allow a reasonable time to comply"); Fed. R. Crim. P. 17(c)(2) ("court may quash or modify the subpoena if compliance would be unreasonable or oppressive"). Further, a party may not be held in contempt for noncompliance with a subpoena when compliance is an impossibility. *See, e.g.*, *In re Marc Rich & Co.*, 736 F.2d 864, 866 (2d Cir. 1984) (noting that the district court "made it perfectly clear that [a contemnor] simply had to produce appropriate affidavits attesting to the impossibility of compliance and the [contempt] judgment would be lifted"). Similar principles apply in the context of

---

[22] When this course of events moves too quickly to allow for an adequate executive privilege review, the President may make a "protective" assertion of executive privilege over a class of documents in order "to ensure [his] ability to make a final decision, after consultation with the Attorney General, as to which specific documents are deserving of a conclusive claim of executive privilege." *Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1, 1 (1996) (Reno, Att'y Gen.); *accord Protective Assertion of Executive Privilege Over Unredacted Mueller Report and Related Investigative Files*, 43 Op. O.L.C. __ (May 8, 2019) (Barr, Att'y Gen.).

congressional subpoenas, particularly given that "Congress and the courts have similar subpoena powers." *Nixon v. Sirica*, 487 F.2d 700, 731 (D.C. Cir. 1973) (en banc) (per curiam).

\* \* \* \* \*

It has long been the Executive Branch's policy to "comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Reagan Memorandum at 1. But the critical functions that White House staff members play when advising and assisting the President in the performance of his constitutional duties require that congressional oversight of the White House be conducted differently from oversight of the departments and agencies. The necessary approach has been described at length in this memorandum opinion, but the core principle is that congressional committees and the White House must work together to accommodate congressional needs for information about the Executive Branch's discharge of statutory obligations in a manner that does not undermine the White House staff's ability to advise and assist the President.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*
